Filed 8/28/20  P. v. Hutchins CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LAJONT HUTCHINS,<br><br>        Defendant and Appellant. | A152657<br><br>(City & County of San Francisco<br>Super. Ct. No. SCN226411) |

J.R. was shot while selling drugs to M.M., girlfriend of defendant Lajont Hutchins.[1]  A jury found defendant guilty of assault with a firearm, battery, possessing a firearm as a felon, conspiracy, and assault with a semiautomatic firearm, and found true firearm enhancement allegations.  On appeal, defendant contends he was deprived of his constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges based on the race of certain prospective jurors.  Defendant further argues the trial court erred in excluding evidence of a prior uncharged act of domestic violence by J.R.  Finally, defendant contends, and the People concede, the case must be remanded to allow the trial court to exercise its discretion to strike the firearm enhancements.  We conclude a

---

[1]     Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim and certain witnesses by their initials.

1

remand is necessary to allow the trial court's reconsideration of the enhancement allegations, but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information with (1) attempted murder (Pen. Code,[2] §§ 664, 187, subd. (a); count one); (2) assault with a firearm (§ 245, subd. (a)(2); count two); (3) battery, with serious bodily injury (§ 243, subd. (d); count three); (4) second degree robbery (§ 211; count four); (5) possession of a firearm by a felon (§ 29800, subd. (a)(1); count five); (6) conspiracy to commit robbery (§ 182, subd. (a)(1); count six); and (7) assault with a semiautomatic firearm (§ 245, subd. (b); count seven).

Counts one and four included allegations that defendant had personally and intentionally discharged a firearm in the commission of a felony and caused great bodily injury (§ 12022.53, subds. (c), (d)).  Counts two, three, six, and seven alleged that defendant had personally used a firearm in the commission of a felony or attempted felony (§ 12022.5, subd. (a)).  Counts one, four, six, and seven further alleged that defendant personally inflicted great bodily injury on a person in the commission of a felony or attempted felony (§ 12022.7, subd. (a)).

At trial, the court rejected defendant's contentions that the prosecutor impermissibly exercised peremptory challenges against several prospective jurors on the basis of their race.  These challenges will be discussed in detail, *post*.  For now, we observe the evidence at trial included the following.

In or around July 2016, J.R.[3] met M.M. at a club, where they used cocaine together in the bathroom.  The two later drove to Mission Street and

---

[2]     All further statutory references are to the Penal Code unless otherwise stated.

[3]     In exchange for his testimony at trial, J.R. received immunity from prosecution for his use, possession, transportation, and sale of drugs.

2

"ended up making out a little bit." They exchanged text messages after that night.

On August 13, 2016, M.M. asked defendant, whom she had been recently dating, to drive her to a party in San Francisco. Defendant dropped M.M. off at her friend's house while he visited an acquaintance named Phil.

J.R. was at the Beauty Bar at 19th Street and Mission Street when he received a text message from M.M. asking for cocaine. J.R. "called around" and was able to purchase a bag containing 14 individual one-half gram baggies. Meanwhile, M.M. contacted defendant, told him she was going to meet a drug dealer to buy cocaine, and asked defendant to pick her up at the Beauty Bar. A friend of Phil's drove defendant and Phil to the bar.

After M.M. arrived at the Beauty Bar, she and J.R. went to the bathroom to try the cocaine. Afterwards, they left the bar to make the transaction, and J.R. led them down a ramp to a parking lot. M.M. asked J.R. multiple times where he kept the cocaine, and he said it was "close to [his] heart and point[ed] at [his shirt] pocket."

J.R. and M.M. went to a corner of the parking lot and talked for a few minutes. J.R. denied that he pulled M.M. in to give her a kiss and that she pushed him away. M.M. stepped away and went up the ramp to make a phone call,[4] and J.R. noticed defendant and another man walking down the ramp behind M.M. when she returned. The two men went past J.R. but turned around and pulled out guns. J.R. denied that one of the men broke his grip on M.M. and that he (J.R.) became angry at the men who had separated them. The gunmen demanded everything J.R. had, and one of the men removed the bag of cocaine from J.R.'s shirt pocket.

---

[4]     Phone records showed a call between M.M. and a phone registered to defendant's mother at around this time.

3

J.R. denied struggling with the gunmen but testified he made contact with the guns "a little bit" trying to keep them down. One of the gunmen struck J.R. with the gun twice on the back of his head. After J.R. told the men he did not have anything else, one of the men fired at J.R., but the first shot missed. J.R. jumped up and ran away, feeling something hit his legs. He was later treated for gunshots to his left heel and below his right calf.

Later that night, M.M. texted defendant, " 'don't forget that dope.' "

Surveillance cameras caught some of the incident on video. The video evidence at trial showed six or seven flashes of gunfire and a person firing a gun in the location where shell casings were later found. The video evidence also showed two men getting out of a vehicle prior to the shooting, leaving in the same vehicle, and making a U-turn to pick up another individual coming from the parking lot where the muzzle flashes occurred. The car had a temporary paper license plate. J.R. identified himself in one the videos walking down the ramp, sitting on the wall with M.M., and then fleeing after the shooting.

The day after the incident, J.R. was interviewed by a police sergeant about the shooting. J.R. gave the sergeant information that allowed the police to identify M.M.'s car, and defendant was soon apprehended after the police stopped M.M.'s car. The police searched the car and found a purse containing a loaded handgun, ammunition, and the paper license plate shown in the surveillance video.

In an interview, defendant told a police sergeant that on the night of the shooting, M.M. "was just going to buy some drugs" and "[w]e were kind of arguing. She kind of was flirtatious with the guy and I kind of took it there; it went too far." The sergeant then asked, "She was buying coke from the guy?" and defendant responded, "Yeah." Asked how it made him feel that

4

M.M. was being flirtatious, defendant responded, "That's when I shot him." Defendant added, "He started being grabby and a little aggressive" with M.M. Defendant further stated that "it was more of a crime of passion" and that he "got caught up in [his] feelings." Defendant claimed he did not take anything from the victim and denied it was a robbery.

At trial, defendant testified he and two acquaintances went to pick up M.M. at the Beauty Bar. Defendant denied that M.M. had called or texted him to meet in the parking lot. Rather, Phil suggested they park in the parking lot and walk to the bar. As they walked down the ramp, defendant heard someone say, " 'No, no, stop,' " and saw J.R. "aggressively grabbing" and "sexually assaulting" M.M. Angry and afraid for M.M., defendant grabbed J.R. and broke them up. He and J.R. exchanged words, but defendant did not demand money or cocaine. J.R. got more aggressive, stood up and "reached for his waistband and he pulled out a gun." Defendant pulled out his gun to protect himself, but J.R. grabbed defendant's gun and "tried to wrestle" it from him. Defendant was able to get control of his gun again and fired shots at the ground to get J.R. to back off. Defendant testified that he never intended to kill J.R. Asked if he recalled shooting his weapon after J.R. started running way, defendant responded, "I don't remember that but after seeing the video, it's clear that I did but I don't remember that though."

After the incident, defendant dropped M.M. at her home and went to "buy some weed" to help him relax. Defendant had suffered an injury to his leg from a bullet grazing him, but he was too afraid to go to the hospital. When M.M. texted him "don't forget that dope," he understood her to be referring to the marijuana.

Defendant further testified that when he told the police sergeant he and M.M. had argued about her being flirtatious with a "guy," he was referring to someone other than J.R. He also testified that he did not know the legal meaning of "crime of passion" when he said it and thought it meant he was in an emotional state. Defendant testified he did not tell the sergeant that J.R. pulled out a gun because he assumed the sergeant saw this on the video.

The jury ultimately found defendant guilty of assault with a firearm, battery, being a felon in possession of a firearm, conspiracy, and assault with a semiautomatic firearm. It also found true the enhancement allegations on these counts. The jury, however, acquitted defendant of attempted murder and robbery.

The trial court sentenced defendant to nine years in prison. Defendant appealed.

## DISCUSSION

### A. *Batson/Wheeler* Claim

During jury selection, defendant exercised one of his peremptory challenges to strike prospective juror Ana D. ("Juror Number 9"), who may have been Hispanic. Ana D. had stated that she had a boyfriend and a family member in law enforcement, and that she felt defendant was more likely to have committed the charged offenses because he had previously pled guilty to a felony. After Ana D. was excused, the trial court invited the prosecutor to exercise her next peremptory challenge and she responded, "People would like to thank and excuse [juror Ana D.]." The court noted that Ana D. "was just excused," and the prosecutor apologized for "[g]etting the names wrong" and struck "Juror Number 6."

6

Shortly thereafter, the prosecutor struck prospective juror Margaret O., which triggered a *Batson/Wheeler*[5] challenge by defendant. Defendant, who is African-American, accused the prosecutor of using her peremptory challenges to strike five Hispanic jurors: Rafael S., Luis A., Jennifer V., Paul F., and Margaret O. The trial court expressed its doubts that Margaret O., Paul F., and Jennifer V. were Hispanic but found "a prima facie case has been made in an abundance of caution" and invited the prosecutor to explain her reasons for excusing these panelists.

The prosecutor first argued that the claim of discrimination against Hispanic prospective jurors made "no sense" because J.R., the victim, was Hispanic. The prosecutor further stated that she had not identified Margaret O. as Hispanic, and that she believed Paul F. to be Filipino and Jennifer V. to be biracial of Caucasian and African-American descent with an Italian last name.

The prosecutor then offered nondiscriminatory reasons for striking the five potential jurors. Margaret O. was struck because she reported a negative experience with police and, according to the prosecutor, she turned her seat away in a hostile manner. Paul F. was struck because his domestic partner was a public defender. Jennifer V. was struck because she expressed sympathy for defendant and said she believed African-Americans are treated unfairly by the justice system. The prosecutor said she challenged Luis A. because he stated in his juror questionnaire and on the stand that he had once been wrongly accused of a crime and believed he had been the victim of racial profiling. He further stated his belief of bias against people of color in the criminal justice system and expressed distrust of witnesses who were

---

[5] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

7

given immunity to testify. Rafael S. was struck because he was a longtime resident of San Francisco's Mission District—the same neighborhood where J.R. sold drugs to M.M.—and admitted he did not like people who sell drugs on the street.

The trial court denied the *Batson/Wheeler* challenge, accepting the prosecutor's explanations and finding the circumstances did not establish group discrimination under a comparative analysis with other jurors.

As jury selection continued, prospective juror Kenneth M., who identified as Hispanic, reported negative experiences with law enforcement and stated his belief that African-Americans were treated differently by police. After the prosecutor excused Kenneth M., defendant raised another *Batson/Wheeler* challenge. The trial court heard from defense counsel and concluded defendant had not presented a prima facie case of discrimination.

Ultimately, one Hispanic individual was seated on the jury.

On appeal, defendant contends he was deprived of his constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges based on racial bias.

"The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her." (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17–18.) A valid peremptory challenge may be based on "the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) However, "[b]oth the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias." (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*), citing *Batson*, *supra*, 476 U.S. at p. 89 and *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) "[T]he obligation to avoid discrimination in jury selection is

a pivotal one. It is the duty of courts and counsel to ensure the record is both accurate and adequately developed." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172 (*Gutierrez*).) "Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude.' " (*Ibid.*)

"The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*Scott*, *supra*, 61 Cal.4th at p. 383.)

Courts must "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " (*Batson*, *supra*, 476 U.S. at p. 93.) A defendant may rely on " 'all relevant circumstances' " to meet his or her burden of persuasion, including the prosecutor's disproportionate use of strikes against a particular racial or ethnic group; side-by-side comparisons of the panelists who were struck and those allowed to serve; the prosecutor's failure to engage in a meaningful voir dire examination of non-stricken panelists on the reasons purportedly grounding a strike; how reasonable or improbable the explanations were and whether the proffered rationale had some basis in accepted trial strategy; any mischaracterization of the evidence; and any history of racial discrimination by the prosecuting

9

office.  (*Miller-El v. Dretke* (2005) 545 U.S. 231, 239–244, 246, 247, 253, 255, 263 (*Miller-El*).)

The trial court is not required to make specific or detailed comments to justify every instance in which it accepts as genuine the prosecutor's race-neutral reason for exercising a peremptory challenge, but " '[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' " (*Gutierrez, supra*, 2 Cal.5th at p. 1171.)

" 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 290.)  " ' "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation].  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]" ' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 975.)

### 1. *Prima Facie Showing*

At the first *Batson/Wheeler* step, it is the defendant's burden " 'to show[] that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168.)  Here, we will assume that substantial evidence supported the trial court's determination of a prima facie showing of purposeful discrimination, as the People do not challenge this finding on appeal.

## 2. *Prosecutor's Nondiscriminatory Justifications*

On the second *Batson*/*Wheeler* step, "the prosecutor must give a 'clear and reasonably specific' explanation of his [or her] 'legitimate reasons' for exercising the challeng[e]." (*Batson*, *supra*, 476 U.S. at p. 98, fn. 20.) The explanation need not be " 'persuasive, or even plausible,' " as " ' "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." ' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 916 (*Reynoso*).) Whether the prosecutor offered a nondiscriminatory reason for exercising a peremptory challenge is a question of law subject to independent review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 198, fn. 9.)

Our review of the record discloses that the prosecutor gave detailed, nondiscriminatory justifications for her peremptory challenges of Rafael S., Jennifer V., Luis A., and Margaret O.[6] Rafael S.'s longstanding residence in the same neighborhood where the crime occurred and his stated dislike of people dealing drugs on the street provided ample grounds for the prosecutor's stated belief that Rafael S. would be unsympathetic to a victim shot during a drug sale in the Mission District. Meanwhile, Jennifer V., Luis A., and Margaret O. all expressed negative views and/or experiences with law enforcement and concerns about bias against African-Americans in the criminal justice system. It is well-settled that views and experiences of this type may justify a prosecutor's peremptory challenge. (*People v. Winbush* (2017) 2 Cal.5th 402, 442 (*Winbush*) [prospective juror's view that criminal justice system is biased]; *People v. Turner* (1994) 8 Cal.4th 137, 171 (*Turner*) [prospective juror's negative experience with law enforcement].) Finally, the

---

[6]     Defendant does not challenge on appeal the prosecutor's stated reasons for excusing Paul F. and Kenneth M.

prosecutor contended that Margaret O. turned away from her in a hostile way. As case law establishes, a prospective juror may be excused based on expressions or gestures observed by counsel. (*People v. Jones* (2011) 51 Cal.4th 346, 360; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1330, fn. 8 (*Perez*).)

### 3. Defendant's Burden to Show Purposeful Discrimination

The " 'critical question' " at the third *Batson/Wheeler* stage " 'is the persuasiveness of the prosecutor's justification for his [or her] peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." ' " (*People v. Johnson* (2015) 61 Cal.4th 734, 755.) " 'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*Ibid.*)

In attempting to carry his ultimate burden of persuasion to prove purposeful discrimination, defendant cites the following factors: (1) the strength of his prima facie showing; (2) the prosecutor's attempt to strike Ana D. (the prospective juror that defendant himself excused); and (3) a comparative juror analysis purportedly showing that the prosecutor did not challenge non-Hispanic panelists who shared the same views as those of the stricken Hispanic panelists. We are not convinced.

First, defendant's prima facie showing was not as strong as he contends. The trial court found that a prima facie case was made "in an abundance of caution" and expressed doubts during defendant's first *Batson/Wheeler* motion that three of the five stricken panelists (Margaret O.,

Paul F., and Jennifer V.) were Hispanic.[7]  Defendant cites nothing in the record to rebut the trial court's doubts on this point.

More importantly, this was not a case with "definite racial overtones" that " 'raise[] heightened concerns about whether the prosecutor's challenge was racially motivated.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 78.) Defendant has not pointed to any facts in this case suggesting a racial motive behind the actions of defendant, his co-conspirators, or the victim. Furthermore, the victim, J.R., was Hispanic and therefore not a member of a group to which the majority of the remaining jurors belonged; indeed, only one Hispanic individual served on the jury.  (*Scott*, *supra*, 61 Cal.4th at p. 384 [evidence relevant to prima facie case includes whether victim is member of group to which majority of the remaining jurors belong].)  On this record, defendant's prima facie showing was not particularly strong.

Defendant's second point is similarly unavailing.  Defendant argues the prosecutor must have based her attempted challenge of Ana D. on race because the trial court recognized Ana D. "appear[ed] to be Hispanic," and there is no dispute her profile contained facts favorable to the prosecution. But the prosecutor's actions drew no scrutiny from either the trial court or defense counsel at the time, and it appears the prosecutor was momentarily confused given the sheer unnecessity of her action.  Consequently, the attempted strike of Ana D. does little, if anything, to demonstrate an underlying discriminatory motive.

Finally, we address the trial court's finding that a comparative juror analysis did not establish a group bias against Hispanic jurors.  "The

---

[7]    After defendant's second *Batson*/*Wheeler* motion, the trial court noted that it "was a little more convinced, having taken a look at the questionnaires and trying to have my memory jogged, looking at the jurors [Margaret O., Paul F., Jennifer V.], it's not clear at all that they were Hispanic."

13

rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 109.) If the prosecutor's proffered reason for striking a minority panelist applies just as well to an otherwise-similar non-minority who is permitted to serve, that is evidence tending to prove purposeful discrimination on the third *Batson* step. (*Miller-El*, *supra*, 545 U.S. at p. 241.)

### *Prospective Juror Rafael S.*

Rafael S. was "born and raised" and lived in the Mission District of San Francisco, and he indicated in his juror questionnaire that he did not like people dealing drugs on the street. The prosecutor acknowledged that "most people would agree it's not a good thing" to have drugs sold in their neighborhood but asked Rafael S. whether the fact that J.R. was apparently engaged in a drug transaction "in the heart of Mission, where you were born and raised" affected his view of J.R. and whether he could be a victim of a crime. Although Rafael S. responded, "I mean I do have my feelings against drug dealers in the Mission. I've seen people deal drugs around me," he said he would be able to convict defendant if the prosecutor proved beyond a reasonable doubt that it was not right for the victim to get shot. As indicated, the prosecutor could credibly strike Rafael S. based on concerns that he might be less likely to sympathize with J.R. for selling drugs in Rafael S.'s neighborhood.

Defendant, however, argues the prosecutor's failure to meaningfully examine Rafael S. and other prospective jurors about the proximity of their residences to the crime scene demonstrates pretext. Specifically, defendant contends that three other prospective jurors and an alternate juror residing

14

in San Francisco "could have lived closer to where [J.R.] sold drugs than did [Rafael S.]."[8]

Defendant's contention is mostly speculative, as the record is devoid of facts indicating that other prospective jurors lived closer than Rafael S. to the location where J.R. sold drugs and was shot. Moreover, it was not simply Rafael S.'s area of residence, but his statements that he had adverse feelings about personally witnessed drug deals in the neighborhood that provided substantial evidence supporting the nonpretextual nature of the strike. The prosecutor's failure to question other prospective jurors who lived in nearby neighborhoods and compare the distances of their residences from the crime scene is not inherently suspicious. Rather, it was entirely plausible for the prosecutor to assume that Rafael S. would identify more strongly with the neighborhood where he was born and raised.

Defendant also contends that using Rafael S.'s residence in the Mission District, with its large Hispanic community, was a proxy for group bias. Even assuming record support for the size of the Hispanic community in the Mission, substantial evidence supported the finding that the prosecutor struck Rafael S. not because she felt residents of the Mission were likely to be biased in a way that hurt the prosecution, but because he lived in the neighborhood where J.R. sold drugs and expressly stated his dislike of drug deals in his neighborhood.

---

[8]     Specifically, defendant contends that two prospective jurors lived in the Castro District, which begins just eight blocks from the Beauty Bar, while Rafael S. could have lived as far as 24 blocks away and still be within the geographical limits of the Mission District. Defendant further contends that another prospective juror and an alternate lived in the South of Market neighborhood, which begins nine blocks from where J.R. sold drugs. We will accept defendant's geographical estimates for the sake of argument.

15

***Prospective Juror Luis A.***

Luis A. recounted that six years before, he had been "falsely accused" of assault, and that "the police acted with racial prejudice against me, a white woman versus Latino man, whatever she says is going to be correct." Asked if this experience "hit home really hard," Luis A. responded, "It still does." Luis A. stated he could set aside his feelings about law enforcement because "Northern California [is a] completely different place than Arizona" where the prior incident occurred. However, Luis A. further indicated that he felt "some sympathy" for defendant because "[i]t's too easy for law enforcement to make judgment calls and mislead on a report."

Luis A. was also asked about his feelings on witnesses receiving immunity in exchange for their testimony. He responded, "Credibility goes a long way. If the person seeking immunity has any kind of credibility or what she will get out—what she's getting out of it or what she stands to lose if she's going to go to jail for a long time, people lie."

Defendant compares Luis A. to two other prospective jurors who were not challenged by the prosecution even though they also stated they would doubt the credibility of an immunized witness. Defendant contends Luis A. was not given the same opportunity as these prospective jurors to provide assurances that their doubts could be overcome. However, it does not appear that the prospective jurors in question had a similar negative experience with law enforcement as Luis A. did, an experience he had already recounted at the time the issue of immunity was raised. Because the prosecutor could have validly stricken Luis A. on his negative law enforcement experiences alone (*Turner*, *supra*, 8 Cal.4th at p. 171), her failure to question Luis A. further on his hostility to immunized witnesses is less significant and does not suggest pretext. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1018,

16

fn. 14 [inference may be drawn from decision to ask few or no questions that prosecutor had already properly determined challenge was warranted based on existing voir dire answers].)

Defendant compares Luis A. to prospective juror 4241082, a non-Hispanic who also expressed sentiments about unfairness against people of color in the criminal justice system but was ultimately retained as an alternate juror. Specifically, Ms. 4241082 "recognize[d] that there can be racial bias. I myself once dropped off a black male friend at a BART station and immediately after dropping him off, I was pulled over for no reason. But you see it in the news, you experience it, and you try to not be biased." Asked whether these experiences would affect her in this case, Ms. 4241082 responded, "I would like to say it would not but it is something you think about."

Comparative juror analysis on a cold appellate record such as this has inherent limitations, such as the difficulty of assessing tone, expression and gesture. (*People v. Taylor* (2009) 47 Cal.4th 850, 887.) Nevertheless, we find substantial evidence to support the trial court's denial of defendant's *Batson*/*Wheeler* challenge. Although both Luis A. and Ms. 4241082 related personal experiences to support their concerns about unfairness in the criminal justice system, Luis A.'s experience involved false allegations and racial profiling committed against him personally, an experience that still affected him. Additionally, it appears unsurprising that the prosecutor did not challenge Ms. 4241082 because, unlike Luis A. who indicated no positive relationships with law enforcement, Ms. 4241082 voluntarily reported having an aunt who was a probation officer and childhood friends in law enforcement. Finally, Luis A. expressed reservations about immunized witnesses that Ms. 4241082 did not. Taken together, Luis A.'s statements

17

credibly supported the prosecution's explanation that Luis A.'s negative experiences and views of law enforcement and immunized witnesses, not his race, were the reasons for his excusal.

### *Prospective Juror Jennifer V.*

The trial court did not find Jennifer V. to be Hispanic, and we defer to the trial court's findings based on its firsthand observations of the proceedings. In any event, we conclude substantial evidence supported the finding that the prosecutor did not strike Jennifer V. on an impermissible basis.

Although Jennifer V. said she would not have a problem finding someone guilty under the reasonable doubt standard, she thought she "would have a little bit higher level if that makes sense" due to "the cases where people had been convicted who were actually innocent and served a lot of time in jail." She further stated she thought it was "the state of reality right now" that African-Americans are at a disadvantage. Asked by the prosecutor whether her concerns would factor into how she would decide this case, Jennifer V. responded, "Yeah. I mean you would have to really prove your case in order for me to say yes, that's a reasonable doubt that I can dismiss." Jennifer V. also stated that when she pictured a robber in her mind, she would assume it was a Latino man.

The prosecutor credibly struck Jennifer V. based on these responses, as they suggested a belief in bias in the criminal justice system (*Winbush, supra*, 2 Cal.5th at p. 442), as well as her own personal biases against Hispanic men. Additionally, Jennifer V.'s statements suggesting the prosecution would have to meet a higher standard of proof than the law requires provided further justification unique to her for exercising the

18

peremptory strike. Defendant does not identify another non-stricken prospective juror comparable to Jennifer V.

### *Prospective Juror Margaret O.*

The trial court did not find Margaret O. to be Hispanic. In any event, the prosecutor credibly based her strike on Margaret O.'s juror questionnaire and statements in which Margaret O. recounted a negative experience with police who "bullied" her family during an investigation of her father. (*Turner*, *supra*, 8 Cal.4th at p. 171.) Although Margaret O. told the prosecutor she could credit police officers with as much credibility as other witnesses, Margaret O. also stated she knew police officers had personal drives and motives. Taken together, Margaret O.'s responses constituted substantial evidence that she was stricken on permissible grounds.

Defendant argues that the prosecutor did not ask sufficient follow-up questions about Margaret O.'s experience with police investigating her father. On the contrary, the prosecutor asked Margaret O. whether her experiences affected her view of law enforcement, and whether any police officers who might testify would be starting out on an even playing field when she heard from them. We perceive no meaningful disparity in the extent of follow-up questions on Margaret O. compared to other jurors who recounted negative experiences with law enforcement.[9]

---

[9] The prosecutor's claim that Margaret O. turned away from her in a manner that seemed hostile was disputed by defendant's counsel, who said she did not observe such a gesture. On a cold appellate record such as this, we cannot verify what the prosecutor claims she saw. (*Perez, supra*, 29 Cal.App.4th at p. 1330.) The trial court, which saw and heard the voir dire proceedings, was in the best position to observe Margaret O.'s demeanor, and we may permissibly imply a finding that the prosecutor's reasons for excusing Margaret O., including the demeanor-based reason, were sincere and genuine. (*Reynoso, supra*, 31 Cal.4th at p. 926.) In any event, we conclude

19

In sum, defendant fails to establish from all the circumstances of the case that Rafael S., Luis A., Jennifer V., and Margaret O. were challenged because of group bias. Accordingly, the *Batson/Wheeler* challenges were properly denied.

## B. Admissibility of Prior Uncharged Act of Violence

Defendant argues the trial court's erroneous exclusion of J.R.'s previous arrest for domestic violence against an ex-girlfriend deprived defendant of the right to present his claim of self-defense that J.R. pulled a gun on him first. We find no abuse of discretion.

Defendant moved in limine to introduce evidence that J.R. had assaulted an ex-girlfriend, K.A., in 2007. K.A. claimed in the police report that on the evening of July 20, 2007, she and J.R. went to several bars in the Mission District, and J.R. got upset that she was dancing with other men. J.R. grabbed her around the neck and pushed her against a wall. K.A. further alleged that J.R. later strangled and choked her before throwing her against automobiles. During the investigation of that incident, J.R. denied choking K.A. and claimed he learned from others that someone else had choked her. J.R. and K.A. spent that night and all of the next day together, and K.A. filed the police report 17 hours after the alleged incident. The police observed a mark on K.A.'s neck, but no signs of petechiae in her eyes suggestive of violent strangulation. No charges were filed.

Defendant argued the evidence was admissible under Evidence Code section 1103 to show J.R.'s character for violence and to prove he was the aggressor in the encounter with defendant. The trial court denied the motion, finding that admission of the evidence would entail "the classic trial

---

the prosecutor had plausible, race-neutral reasons for excusing Margaret O. based on her experience-based statements alone.

20

within a trial." Specifically, the court observed the incident was ten years old, the accounts of the incident were "significantly divergent," and it would be "extremely difficult" to prove who was at fault. The court further found that the issue would "take up an undue consumption of time with very little probative value," as the earlier alleged incident did not involve a gun and was not in the context of a robbery or drug deal.

When self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible under Evidence Code section 1103, subject to the limitations articulated in Evidence Code section 352. (*People v. Wright* (1985) 39 Cal.3d 576, 587.) Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's exclusion of evidence under Evidence Code section 352 is reviewed for abuse of discretion (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121) and will not be disturbed unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice (*People v. Rogers* (2013) 57 Cal.4th 296, 326 (*Rogers*)).

Even though the 2007 incident occurred more than nine years before the charged offenses here, defendant argues the evidence was sufficiently relevant because Evidence Code section 1109, subdivision (e), makes evidence of domestic violence presumptively inadmissible only if the incident occurred more than ten years before the charged offense. Even so, the allegations against J.R. were unproven, and charges were never filed. " '[U]ncharged offenses are admissible only if they have *substantial* probative value.' "

21

(*Rogers*, *supra*, 57 Cal.4th at p. 331.)  Here, the evidence in question offered little probative value for defendant's self-defense claim as the 2007 incident did not involve J.R.'s propensity to use a gun.  Although the evidence may have supported defendant's claim that J.R. was aggressive to M.M., it would do little to advance the defense that J.R. had first threatened defendant with a gun.

Furthermore, the trial court reasonably concluded that any probative value the evidence had would be substantially outweighed by the probability that its admission would entail an undue consumption of time.  (Evid. Code, § 352.)  As the trial court found, the accounts of the incident were wildly divergent, and the issue would entail testimony from J.R., K.A., and several potential witnesses alluded to in the police report concerning a long-past incident that was disputed and never reached the point of formal charges.  "Such a proceeding would consume considerable time, and divert the attention of the jury from the case at hand."  (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1458.)  Thus, it was not arbitrary, capricious, or patently absurd for the trial court to refuse to allow the trial to descend into this collateral inquiry.

Finally, any assumed error in excluding the evidence of the 2007 incident was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) because it is not reasonably probable that defendant would have obtained a more favorable result in the absence of the claimed error.  (*People v Trujeque* (2015) 61 Cal.4th 227, 280; *People v. Cunningham* (2001) 25 Cal.4th 926, 998–999.)  Defendant did not dispute that the video evidence showed him firing at J.R. as he ran away.  In the immediate aftermath of the incident, defendant admitted to shooting the victim, not in self-defense because of J.R. first drawing a gun, but in a "crime of passion" after

22

witnessing his girlfriend acting flirtatiously with "the guy" she was "buying coke from." The jury heard—and apparently rejected—defendant's attempts on the stand to explain away his failure to mention J.R.'s gun to the police and his claim that he was jealous of M.M. flirting with someone other than J.R. On this record, defendant fails to show a reasonable probability that the jury would have viewed his claim of self-defense more favorably had the trial court admitted evidence of a contested and uncharged domestic assault by J.R. that occurred nine years before the charged offenses.

### C. Ineffective Assistance of Counsel

Defendant contends he was denied effective assistance of counsel because his trial counsel failed to "fully and adequately" argue the first two claims of error discussed above.

Defendant fails to demonstrate that counsel's representation fell below an objective standard of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Generally, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. (*People v. Weaver* (2001) 26 Cal.4th 876, 926.) Here, defendant's trial counsel twice brought *Batson/Wheeler* motions claiming the prosecutor was discriminating against Hispanic jurors and also sought to introduce the evidence of J.R.'s prior arrest. Defendant identifies no particular deficiency in counsel's arguments or tactics below. Accordingly, defendant's ineffective assistance claim fails.

### D. Discretion to Strike Firearm Enhancements

As mentioned, defendant was convicted of assault with a firearm (count two), battery (count three), conspiracy (count six) and assault with a semiautomatic firearm (count seven), and the jury found true the allegations

that he personally used a firearm in the commission of these crimes. (§ 12022.5, subd. (a).)

Senate Bill No. 620, effective January 1, 2018, amended section 12022.5, subdivision (c), and section 12022.53, subdivision (h), to provide that "[t]he court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement" otherwise required to be imposed by those sections. (*People v. Zamora* (2019) 35 Cal.App.5th 200, 206–207.) As the People acknowledge, this change in law applies retroactively to individuals, like defendant here, whose sentences were not final at the time Senate Bill No. 620 became effective. (*Zamora*, *supra*, at p. 208.) Thus, we will remand so that the trial court can exercise its discretion whether to strike the firearm enhancements under section 12022.5, subdivision (a), for counts two, three, six, and seven.

## DISPOSITION

The sentence is vacated, and the matter is remanded to allow the trial court to exercise its discretion under section 12022.5, subdivision (c). In the event the trial court strikes any of the firearm enhancements imposed under section 12002.5, subdivision (a), the court shall resentence defendant accordingly and send an amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____

FUJISAKI, J.

We concur.

_____

SIGGINS,  P.J.

_____

PETROU, J.

(A152657)